**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____
                                        :
**TRAVELERS PROPERTY CASUALTY**   :
**COMPANY OF AMERICA,**            :
       **Plaintiff,**            :
    **v.**                          :     **CIVIL NO. 05-CV-6399**
                                        :
**COOPER CROUSE-HINDS, LLC, et al.,** :
      **Defendants.**          :
_____ :

## MEMORANDUM OPINION & ORDER

**RUFE, J.**                                         **August 31, 2007**

This is a subrogation action in which Plaintiff claims that a light fixture designed and manufactured by Defendants caused a serious fire. Presently before the Court is Defendants' Motion for Summary Judgment. Defendants seek the entry of judgment based on two theories: first, Defendants ask the Court to enter judgment in their favor based on Plaintiff's alleged spoliation of evidence; alternatively, Defendants ask the Court to rule that the expert opinions offered by Plaintiff's experts are inadmissible and, therefore, to enter judgment against Plaintiff because it will not be able to prove essential elements of its case at trial. Additionally, Defendants seek dismissal of Plaintiff's breach-of-warranty claim based on the applicable statute of limitations. After considering the parties' arguments and the relevant law, the Court has determined that summary judgment will be granted in part and denied in part.

### I. FACTUAL BACKGROUND

On May 22, 2003, a fire seriously damaged a building owned by Ferrick Construction Company ("Ferrick"). Ferrick insured the building through a policy that it purchased from Travelers Property Casualty Company of America ("Travelers" or "Plaintiff"). Travelers, faced with the

probability that it would receive a damages claim from Ferrick, immediately began investigating the fire's cause. It retained a cause-and-origin investigator, John Christmas, who examined and photographed the scene within seven days of the fire. Based on his suspicion that a fluorescent light fixture, which was suspended by chains above a set of wall shelving, could have been the source of the fire, he photographed the fixture in its position at the scene of the fire. This fixture was an eight-foot-long Crouse-Hinds model H-2200E fluorescent light, which apparently had been in place since at least 1991, when Ferrick purchased the building. Christmas's photographs of the fixture in position at the Ferrick building show that, at that time, the two lampholders and the bracket that held the lampholders on the damaged end of the light fixture were still intact. After photographing the fixture, he removed it and sent it to the Travelers laboratory to determine the "exact ignition scenario" for the fire.

John Sleights, a Travelers employee, documented the fixture's receipt at the laboratory. He unpacked, photographed, and examined the fixture on June 25, 2003.[1] At that time, Sleights inventoried the parts received and documented the absence of several key components: the removable wiring-compartment cover, the branch-circuit wiring, and the lampholders from the fire-damaged end of the fixture.[2] After examining the fixture, he noted markings on the remaining wiring-compartment cover and on the side of the fixture, which identified the manufacturer as "Crouse Hinds Lighting."[3]

For almost two more years, Travelers continued to investigate the fire and to

---

[1] Defs.' Mot. for Summ. J. [Doc. # 23], Ex. D, Impact Note Printout, at 1.

[2] Id. at 1–2.

[3] Id. at 2.

contemplate a possible subrogation suit.  Plaintiff's cause-and-origin expert, John Christmas, ultimately determined that the fire originated at the light fixture.  Unfortunately, Christmas died during the course of the investigation.  The file was therefore transferred to Louis Gahagan, another cause-and-origin expert who worked for Christmas's employer.  After reviewing the entire file—including the photographs, the various reports, and Christmas's opinion—Gahagan provided an opinion concerning the fire's origin that mirrored Christmas's opinion.  The Springfield Township fire marshal, Richard Lesniak, arrived at a similar conclusion, determining that the fire originated at the light fixture and was caused by heat from the light fixture that ignited a cardboard box next to the fixture.

In April 2005, the light fixture—without the components that Sleights had documented as missing—was forwarded to Travelers' expert, John Zicherman, for examination. After examining the fixture, Zicherman concluded that the spring-loaded design of the lampholders on the fire-damaged end of the fixture caused a gap to develop between the electrodes of the lamps and the lampholders as a result of the overheating of plastic insulators on that end of the fixture. According to Zicherman, this gap was then filled by a high-voltage discharge or an electrical arc, which caused the insulating materials to deteriorate.  As they deteriorated, heated particles of the insulating materials were ejected from the fixture, igniting the blaze.  Zicherman's conclusion forms the primary basis of the instant subrogation suit.

In May 2005, based on Zicherman's theory, Travelers filed a complaint in the Montgomery County Court of Common Pleas.  The complaint asserts claims of strict products liability, negligence, and breach of warranty against numerous Crouse-Hinds entities, some of which

have never existed or are unaffiliated with the fixture's manufacturer.[4]  In December 2005, after service was effectuated, Defendants removed the action to this Court under 28 U.S.C. § 1441.

Despite anticipating a subrogation suit against Defendants no later than winter 2004, Plaintiff did not provide them with an opportunity to examine the allegedly defective light fixture until August 2006.  At that time, Zicherman sent the fixture to Crouse-Hinds' counsel, who forwarded it to their retained expert, Steven Rowe.  When Rowe received the fixture, it was missing an additional component: the bracket that held the lampholders onto the fire-damaged end of the fixture.  As a result, when Defendants' expert was finally able to examine the fixture, it and its components were in a substantially different condition than they were when Plaintiff and its experts were able to examine them.

After discovery concluded, Defendants filed the instant Motion for Summary Judgment.  In their Motion, they argue that judgment should be entered in their favor because Plaintiff failed to preserve integral evidence that Defendants should have been able to examine in order to prepare their defense.  Alternatively, they argue that Plaintiff's expert reports are overly speculative and thus inadmissible; as a result, they argue, Plaintiff has failed to adduce evidence in support of its claims sufficient to proceed to a jury trial.  Finally, they argue that Plaintiff's breach-of-warranty claim must be dismissed because it is time-barred.

Plaintiff has responded by informing the Court and Defendants that its only theory of liability is that the fixture was defectively designed.  Thus, even though some parts of the light

---

[4]  The Complaint names: Crouse-Hinds Co.; Cooper Industries, Inc.; Cooper Crouse-Hinds, LLC; Cooper Lighting, Inc.; Crouse-Hinds Lighting; Crouse-Hinds Lighting, Inc.; Crouse-Hinds Lighting Co.; and Crouse-Hinds Lighting Co., Inc.  In August 2007, Plaintiffs voluntarily dismissed the unrelated entities, leaving only Cooper Crouse-Hinds, LLC, and Cooper Lighting, Inc., as Defendants.

fixture deteriorated before Defendants could examine them, Defendants can prepare an adequate defense by examining the photographs of the light fixture before it was removed from the fire scene, and by testing an exemplar light fixture, which has been provided to them.  Additionally, Plaintiff argues that its experts' opinions are admissible under Federal Rule of Civil Procedure 702.  Plaintiff's Response fails, however, to address Defendants' statute-of-limitations argument for dismissing the breach-of-warranty claim.

After briefing concluded, the Court held oral argument on the Motion.  At oral argument, the parties reiterated their positions concerning spoliation.  Plaintiff also reiterated that it intended to proceed on one theory only—strict liability for a design defect.  As such, it does not intend to assert any other claims of strict products liability or to pursue its negligence or breach-of-warranty claims.

## II.  DISCUSSION

### A.  Plaintiff's Breach-of-Warranty Claim

Initially, it is appropriate to address Plaintiff's breach-of-warranty claim.[5]  Defendants argue that Plaintiff's breach-of-warranty claim must be dismissed on statute-of-limitations grounds.  Under Pennsylvania law, the statute of limitations for a breach-of-warranty claim is four years,[6] and the limitations period runs from the date that delivery is tendered.[7]  Thus, under the statute, Plaintiff

---

[5]  Plaintiff has essentially abandoned its breach-of-warranty claim by failing to oppose Defendants' statute-of-limitations argument in its Response to the Motion for Summary Judgment, and by acquiescing to Defendants' assertion at oral argument that the claim had been conceded.  Regardless of this abandonment, the law requires the Court to enter judgment in Defendants' favor on this claim.

[6]  13 Pa. Cons. Stat. § 2725(a) (1999); Williams v. W. Penn Power Co., 467 A.2d 811, 814 (Pa. 1983).

[7]  § 2725(b) (noting only one exception to the general rule); Patton v. Mack Trucks, Inc., 519 A.2d 959, 962 (Pa. Super. Ct. 1986); see also Titanium Metals Corp. v. Elkem Mgmt., Inc., 87 F. Supp. 2d 429, 430 (W.D. Pa. 1998).

was required to file an action for breach of warranty within four years of the date on which Defendants tendered delivery of the fixture.  According to the deposition testimony of Janice and Thomas Ferrick, the light fixture was in place when they purchased the building, well over 15 years ago.[8]  Thus, it is undisputed that the light fixture was "delivered" more than four years before the date that the instant action was filed.[9]  Consequently, the claim is barred by the applicable statute of limitations, and the Court will therefore enter judgment in favor of Defendants on this claim.

## B.  Strict-Liability and Negligence[10] Claims

### 1.  Required Proof

Before considering Defendants' arguments as to the remaining claims, it is first necessary to identify the elements that Plaintiff will need to establish in order to prove its claims, because these elements will guide the Court in its consideration of the requested spoliation sanction and the sufficiency of Plaintiff's evidence.

Plaintiff has informed the Court that its only theory of liability is that the light fixture was defectively designed.[11]  To establish its strict-liability claim, therefore, it will have to prove that: (1) the light fixture was defectively designed in that it should have been designed to be safer;[12] (2)

---

[8]  See J. Ferrick Dep. 29:8–11, 30:19–23, Aug. 22, 2006; T. Ferrick Dep. 33:2–11, Sept. 25, 2006.

[9]  The Court notes that there is a notation in Plaintiffs' records suggesting that the fixture was "installed by [the insured] and several of his employees 8 years ago."  Defs.' Mem. in Support of Mot. for Summ. J. [Doc. # 23], at Ex. D, 5.  Even if the Court were to credit this notation over the testimony of the insured and his wife, it is clear that the fixture was nonetheless "delivered" over four years before the date that the instant suit was commenced.

[10]  Even though Plaintiff has informed the Court that it does not plan to pursue its negligence claim, the Court will, in an abundance of caution, briefly consider Plaintiff's ability to prove that claim at trial.

[11]  See Pl.'s Resp. to Defs.' Mot. for Summ. J. [Doc. # 16] ¶17; Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. [Doc. # 16-2], at 5.

[12]  See Spino v. John S. Tilley Ladder Co., 696 A.2d 1169, 1172 (Pa. 1997).

the defect existed when the light fixture left Defendants' control; and (3) the defect was the proximate cause of the fire.[13]  To prove proximate cause, Plaintiff must establish that the defect was a substantial factor in causing the fire.[14]

To establish its negligence claim, Plaintiff will have to prove that: (1) Defendants owed a duty to design its product against reasonably foreseeable hazards; (2) Defendants breached that duty; (3) the breach proximately caused the fire; (4) and the fire caused actual losses or damages.[15]  Breach is determined under the traditional reasonable-person test; thus, the integral element of the cause of action is whether the defendant manufacturer exercised reasonable care in its design of the product.[16]

## 2. Whether the Alleged Spoliation Requires Summary Judgment

First, Defendants argue that summary judgment should be entered in their favor as a sanction for Plaintiff's spoliation of evidence.  They claim that Plaintiff intentionally allowed the damaged light fixture to deteriorate before letting Defendants examine it.  As a result, Defendants argue, they have been unable to adequately evaluate Plaintiff's theories of liability.  Plaintiff claims that although parts of the fixture deteriorated, the deterioration was unintentional and should not be attributed to Plaintiff.  Moreover, Plaintiff argues, Defendants have not been prejudiced by the deterioration because they can test its design-defect theory of liability using an exemplar light fixture.

---

[13]  See Davis v. Berwind, 690 A.2d 186, 190 (Pa. 1997).

[14]  See Spino, 696 A.2d at 1172.

[15]  See Phillips v. Cricket Lighters, 883 A.2d 439, 1008 (Pa. 2003); 3A Summ. Pa. Jur. 2d Torts § 41:413 (Oct. 2006).

[16]  3A Summ. Pa. Jur. 2d Torts § 41:413.

a. <u>Whether Plaintiff Spoliated Evidence</u>

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."[17] A party that reasonably anticipates ensuing litigation has an affirmative duty to preserve evidence that may be relevant, and failing to do so constitutes spoliation.[18] A spoliating party may be subject to a variety of sanctions, including: "(1) dismissal of a claim or granting judgment in favor of a prejudiced party; (2) suppression of evidence; (3) an adverse inference, referred to as the spoliation inference; (4) fines; [and/or] (5) attorneys' fees and costs."[19]

No specific sanction is mandated by law when a court finds that a party is liable for spoliation; instead, the decision is left to the district court's discretion.[20] The Third Circuit Court of Appeals has, however, set forth standards for district courts to employ in deciding whether and to what extent sanctions should be awarded for spoliation of evidence. In <u>Schmid v. Milwaukee Electric Tool Corp.</u>,[21] the Third Circuit instructed that courts considering sanctions against a spoliating party must balance three factors: (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) the availability of a sanction less than entering judgment against the spoliating party that will adequately

---

[17] <u>Paramount Pictures Corp. v. Davis</u>, 234 F.R.D. 102, 110 (E.D. Pa. 2005) (quotation omitted).

[18] <u>See Howell v. Maytag</u>, 168 F.R.D. 502, 505 (M.D. Pa. 1996).

[19] <u>Paramount</u>, 234 F.R.D. at 110–11.

[20] <u>Id.</u> at 111.

[21] 13 F.3d 76 (3d Cir. 1994). The Pennsylvania Supreme Court has adopted this standard. <u>See Schroeder v. PENNDOT</u>, 710 A.2d 23, 27 (Pa. 1998).

protect the opposing party's rights and deter future similar conduct.[22]    But, in exercising its discretion, a court should resort to the drastic sanction of entering judgment against a spoliating party only when "no alternative remedy by way of a lesser, but equally efficient sanction is available."[23]

Considering the circumstances in this case, Plaintiff is liable for spoliating evidence because it failed to ensure the preservation of integral evidence after litigation became reasonably foreseeable, thereby depriving Defendants of the ability to examine the fixture in the same condition to which Plaintiff was privy.  Plaintiff learned who manufactured the light fixture no later than June 2003 when John Sleights unpacked and examined it at the Travelers lab.[24]  By no later than January 2004, Plaintiff had determined that a subrogation suit against Defendants was imminent, and that it was required to place Defendants "on notice for an exam."[25]  Nonetheless, Plaintiff allowed at least two-and-a-half years to pass between the time it was considering a subrogation claim against Defendants and the time it provided Defendants with an opportunity to examine the light fixture. During that time, damaged components of the light fixture were either lost or completely deteriorated, leaving the fixture in a substantially different state than it was when Plaintiff's employees and experts were able to examine it.  Plaintiff ignored its duties to notify Defendants—the manufacturer of the light fixture at the center of Plaintiff's investigation from its inception—of a potential subrogation claim and to provide Defendants with an opportunity to examine the light fixture at the earliest possible time, while the fixture and its components were still intact.

---

[22] Schmid, 13 F.3d at 79.

[23] Baliotis v. McNeil, 870 F. Supp. 1285, 1289 (M.D. Pa. 1994).

[24] See Defs.' Mem. in Support of Mot. for Summ. J. [Doc. # 23], at Ex. D, 1–2.

[25] See id. at Ex. D, 3.

Moreover, Plaintiff's employees and retained experts failed to take adequate precautions to protect the damaged components while they handled and shipped them. Even though the components were damaged in the fire, they were clearly intact when Plaintiff's investigation began, and their ultimate deterioration could likely have been avoided had Plaintiff exercised due care in their handling.[26]  Considering that a significant segment of Plaintiff's daily operations includes conducting loss investigations for the purpose of subrogation actions, it is clear that Plaintiff knew that: (1) fire-damaged materials are likely to deteriorate over time unless special precautions are taken to preserve them;[27] and (2) it was imperative to contact the party potentially liable for the fire as soon as possible so that the fixture and its components could be examined. They failed, however, to meet their obligations—whether intentionally or recklessly—and therefore have threatened the integrity of the proceeding before this Court. As such, Plaintiff is subject to sanctions for its conduct.

b. The Appropriate Sanction for Plaintiff's Spoliation

In light of Plaintiff's spoliation, the Court must determine whether the entry of summary judgment is an appropriate sanction. The Court does so by conducting the inquiry prescribed in Schmid.

First, the Court must examine the degree of fault on the part of Plaintiff in failing to preserve the fixture for Defendants' inspection. Here, while Plaintiff is at fault for failing to timely notify Defendants that their product was the subject of a subrogation investigation, and for failing

---

[26]  In fact, Plaintiff's own expert noted that the components could have been preserved had they been placed in an epoxy resin, Zicherman Dep. 109, Jan. 17, 2007, or at least better protected had they been properly packaged for transport, id. 110.

[27]  See, e.g., id. 109–10.

to provide Defendants with an immediate opportunity to examine the fixture, it does not appear that Plaintiff either intentionally or maliciously destroyed parts of the fixture or purposefully allowed the fixture to deteriorate.[28]   Rather, it appears that a protracted investigation combined with Plaintiff's negligent and/or reckless conduct caused the loss or destruction of the components.   Regardless, Plaintiff had control over the fixture and failed to provide it to Defendants in a timely manner or to provide Defendants with an opportunity to examine the fixture contemporaneously with its own experts.   Additionally, Plaintiff demonstrated, at a minimum, negligence in handling the light fixture and failing to take the steps necessary to preserve evidence such as the damaged lampholders.

Second, the Court must examine the degree of prejudice suffered by Defendants as a result of the spoliation.   As Defendants note, the components that deteriorated are the very components that Plaintiff alleges to be defectively designed.   Since the components have essentially disintegrated, Defendants cannot inspect them or test them.   At the same time, it is unclear why Defendants need to inspect and/or test the actual components.   Plaintiff is proceeding on a design-defect theory and, as the court noted in Schmid, "the potential for prejudice is much less in a design defect case."[29]   Defendants can likely analyze Plaintiff's design-defect theory "as well or better by inspecting and testing multiple [fixtures] of the same design than by inspecting the particular [fixture] involved in the [fire]."[30]   Moreover, Defendants can examine the myriad photographs that reflect the condition of the fixture and its components immediately after the fire.   Ultimately,

---

[28]  As discussed in *infra* note 35, intentional or bad-faith destruction is not required for a finding of spoliation.  Even unintentional destruction, if the result of unreasonable conduct, subjects a party to sanctions.

[29]  Schmid, 13 F.3d at 80.

[30]  See id.; see also Lee v. Boyle-Midway Household Prods., Inc., 792 F. Supp. 1001, 1005 (W.D. Pa. 1992).

examining the actual fixture involved in the fire is not integral to a defense against Plaintiff's design-defect theory.[31]

Still, it is understandable that Defendants would want the opportunity to inspect the fixture in a condition as close as possible to its condition at the time of the accident, primarily for purposes of their causation analysis.  It does not appear, however, that an earlier inspection—taking place contemporaneously with Plaintiff's experts' inspections—would have produced information that would be helpful to the Defendants' case, including their case on causation.  The light fixture, particularly the end alleged to be defectively designed, was severely damaged in the fire, and the now-missing components would have shed little light on the cause of the fire since they were seriously damaged even before Plaintiff's experts inspected the fixture.  Moreover, Defendants' assertion that an earlier examination would have revealed important information or evidence is unconvincing in light of their failure to "come forward with plausible, concrete suggestions as to what that evidence might have been."[32]  Thus, while the Court believes that Defendants have suffered some prejudice as a result of the spoliation, the degree of prejudice is minimal.

Finally, the Court must consider the availability of sanctions less severe than the entry of judgment in Defendants' favor that can adequately protect Defendants' rights and deter future spoliation by Plaintiff or others.  As the Third Circuit has held, the sanction of default judgment should be employed only in the most egregious of spoliation cases.  This is not one of those cases.

---

[31] The Court notes that this would not be the case were Plaintiff proceeding under a manufacturing-defect theory.  In that scenario, Defendants would be severely prejudiced because, without an opportunity to examine the components alleged to be defectively manufactured, they would have no ability to defend the integrity of their manufacturing of the particular light fixture at issue.  Plaintiff has explicitly abandoned any claims based on a manufacturing-defect theory, however, so the Court's prejudice inquiry is limited to Plaintiff's design-defect theory.

[32] See Schmid, 13 F.3d at 80.

Here, Plaintiff's spoliation apparently resulted from a lack of care and a failure to take reasonable precautions to protect the integrity of the light fixture and its components, as well as a failure to promptly notify Defendants that their product was the potential subject of a subrogation suit. While it does not appear that the components were intentionally destroyed before Defendants could examine them, Plaintiff took no affirmative steps to ensure their preservation.

In a case such as this, a sanction less severe than the entry of judgment is appropriate. At the same time, the sanction must sufficiently serve remedial, punitive, and deterrent functions: it must remedy the injustice done to the injured party, punish the spoliator for its wrongful conduct, and deter the spoliator and other potential spoliators by alerting litigants before this Court that this type of behavior will not be tolerated in the future. Accordingly, the most logical sanction is the spoliation inference, which is "an adverse inference that permits a jury to infer that 'destroyed evidence might or would have been unfavorable to the position of the offending party.'"[33] The inference flows from the idea that when "a party has notice that evidence is relevant to an action, and either proceeds to destroy that evidence or allows it to be destroyed by failing to take reasonable precautions, common sense dictates that the party is more likely to have been threatened by that evidence."[34]

Levying the spoliation inference against a party accused of failing to preserve integral evidence is appropriate when: (1) the relevant evidence was within the accused party's control;

---

[33] MOSAID Techs. Inc. v. Samsung Elecs. Co., 348 F. Supp. 2d 332, 336 (D.N.J. 2004) (quoting Scott v. IBM Corp., 196 F.R.D. 233, 248 (D.N.J. 2000)).

[34] Id. at 338 (citing Schmid, 13 F.3d at 78).

(2) the party's conduct resulted in the suppression, withholding, or destruction of the evidence;[35]

(3) the evidence was relevant to the opposing party's claims or the accused party's claims; and (4) it

was reasonably foreseeable that the evidence would later be discoverable by the opposing party.[36]

Here, Plaintiff possessed the light fixture from the time it was removed until August

2006; by failing to take adequate precautions to protect the fixture and its components, and by failing

to notify Defendants of the planned subrogation suit in a timely manner, integral pieces of evidence

were destroyed before Defendants could examine them; the destroyed components are relevant to,

at a minimum, causation issues; and, from the moment that Plaintiff began considering a subrogation

action against Defendants, it was reasonably foreseeable that the components would later be

discoverable by Defendants to prepare their defense against Plaintiff's claims.  Consequently, while

Plaintiff's conduct does not warrant the entry of judgment or dismissal of any claims, its conduct is

sufficiently improper to justify imposition of the spoilation-inference sanction.  The Court therefore

declines to enter summary judgment against Plaintiff based on the spoliation—at least as to the

claims based on a design defect[37]—but will instruct the jury with the spoliation inference based on

Plaintiff's failure to preserve evidence.

---

[35] As the court noted in MOSAID, the Third Circuit has yet to articulate whether this element requires a court to find intentional destruction or some level of bad faith.  348 F. Supp. 2d at 337.  This Court agrees with the conclusion in MOSAID, however, that a flexible approach that does not require intentional or knowing destruction "is the better and more appropriate approach."  Id. at 337–38.  While purely accidental destruction may not be sanctionable, see Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 334 (3d Cir. 1995), the spoliation inference is appropriately imposed when the party exhibits some level of negligence or recklessness in failing to preserve evidence for an opposing party's examination, as long as the other three requirements are also met.  "By allowing the spoliation inference in such circumstances, the Court protects the integrity of its proceedings and the administration of justice."  MOSAID, 348 F. Supp. 2d at 338.

[36] See Davis, 234 F.R.D. at 112; MOSAID, 348 F. Supp. 2d at 335.

[37] See supra note 31.

### 3.  Sufficiency of Plaintiff's Expert Opinions to Create Issues of Fact for Trial

a.  Summary-Judgment Standard

Under Federal Rule of Civil Procedure 56(c), the Court should grant summary judgment to the moving party if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[38]  In making this determination, the Court "'must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor.'"[39]

Although this standard of review is designed to give the nonmovant the benefit of every doubt, it must still produce enough evidence such that a reasonable jury could find in its favor at trial.  Specifically, "the plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[40]

b.  Admissibility and Sufficiency of Expert Opinions

To demonstrate its ability to prove its case at trial, Plaintiff has submitted the expert reports and depositions of two purported experts: John Gahagan and Joseph Zicherman.  Plaintiff argues that the conclusions reached by its experts create genuine issues of material fact concerning both the existence of a defect and causation, which are sufficient at least to avoid the entry of summary judgment against it.  Defendants argue, however, that the expert opinions are inadmissible

---

[38] Fed. R. Civ. P. 56(c).

[39] Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007) (internal citation omitted).

[40] Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

and, therefore, Plaintiff has failed to adduce competent evidence in support of essential elements of its claims.   Accordingly, the Court must determine if the opinions offered by Plaintiff will be admissible at trial, and whether they are sufficient to create a triable jury issue.

### 1)   Legal Standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony.   Under Rule 702:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient fact or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts.

Guided by the seminal Supreme Court decision in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>,[41] the Third Circuit has held that Rule 702 has two major requirements: (1) "the proffered 'expert' must be qualified to express an expert opinion"; and (2) "the proffered expert opinion must be reliable."[42] The qualifications requirement "is liberally interpreted and includes 'a broad range of knowledge, skills, and training.'"[43]   The reliability requirement is slightly more exacting, but the standard for determining reliability "is not that high"[44]—that is, "the evidentiary requirement of reliability is lower than the merits standard of correctness."[45]

---

[41]   509 U.S. 579 (1993).

[42]   <u>In re TMI Litig.</u>, 193 F.3d 613, 664 (3d Cir. 1999) (citing <u>In re Paoli R.R. Yard PCB Litig.</u>, 35 F.3d 717, 741 (3d Cir. 1994)).

[43]   <u>Id.</u> (quoting <u>Paoli</u>, 35 F.3d at 741).

[44]   <u>Paoli</u>, 35 F.3d at 745.

[45]   <u>Id.</u> at 744.

The reliability requirement mandates that "'the process or technique [as opposed to the conclusion] the expert used in formulating the opinion is reliable.'"[46]  It does not require the parties "to prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of the evidence that their opinions are reliable."[47]  Generally, expert opinions will be admissible "if there are 'good grounds' for the expert's conclusions,"[48] "even if the judge believes 'there are better grounds for some alternative conclusion,' and that there are some flaws in the [expert's] methods."[49]

The Third Circuit has set forth several factors to consider in determining whether an expert's methodology is sufficiently reliable under Rule 702.  Those factors include:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.[50]

If, after considering these factors, the court ultimately determines that an expert opinion is based upon reliable methodology, then the opinion will generally be admissible, so long as it is relevant and offered by a person qualified as an expert.[51]

---

[46] TMI, 193 F.3d at 665 (quoting Paoli, 35 F.3d at 742).

[47] Paoli, 35 F.3d at 744.

[48] Heller v. Shaw Indus., Inc., 167 F.3d 146, 153 (3d Cir. 1999) (quoting Paoli, 35 F.3d at 744).

[49] Id. at 152 (quoting Paoli, 35 F.3d at 744).

[50] Paoli, 35 F.3d at 742 n.8.

[51] See Fed. R. Evid. 702.

2) Discussion

Defendants argue that none of the expert opinions offered by Plaintiff in support of its case is admissible.[52]  While citing virtually no case law, they argue that the opinions offered by Gahagan and Zicherman are inadmissible under the Federal Rules of Evidence and, therefore, Plaintiff has failed to put forth competent evidence in support of its case.  The Court will address each of these expert opinions, in turn.

a)  Louis Gahagan's Opinion as to Cause

According to Defendants, Plaintiff will offer Gahagan's expert testimony to support its design-defect and negligence claims, and such testimony should be inadmissible because his opinions do not have a proper basis.  After reviewing the record, the Court cannot agree.

Defendants do not challenge Gahagan's qualifications to offer an expert opinion, for good reason.  Gahagan has been in the fire-fighting and fire-investigation business for over 35 years. He served as a firefighter for eight years, a lieutenant and assistant fire marshal in the Philadelphia Fire Department for seven years, and a fire investigator for 20 years.  He has attended many specialized training programs, and has served as an instructor at numerous programs.  He has testified as an expert witness in numerous lawsuits over the last five years.  His knowledge, skill, experience, training, and education clearly qualify him as an expert.

---

[52]  Defendants explicitly argue only that the opinions of Gahagan and Zicherman are inadmissible.  Fire Marshal Lesniak was, however, deposed in this case, and the opinion that he offered at his deposition concerning the likely cause of the fire is currently before the Court in support of Plaintiff's case.  Since Defendants have failed to challenge its admission, and the Court sees no reason that the opinion would be inadmissible at trial, the Court will consider it as a factor in creating a genuine issue of material fact as to causation.  As Fire Marshal Lesniak noted in his deposition: "My conclusion was that the fire was accidental in nature resulting from cardboard boxes stored against the fluorescent light fixture, and the heat from the fixture ignited the cardboard box, and then, in turn, ignited combustible materials stored on the shelving unit."  Lesniak Dep. 69:22–70:4, June 15, 2006.  While this opinion does not speak to a defect in the light fixture, it does identify the light fixture as the likely origin of the fire.

Accepting Gahagan's qualifications, Defendants instead challenge the basis of the opinion that he intends to offer at trial.  They claim that his testimony would amount to nothing more than the inadmissible transmission of Jack Christmas's opinion in this case, which the Federal Rules do not sanction.  Moreover, they argue that his opinion, even if admissible, offers nothing in support of Plaintiff's design-defect or negligence theories, because it addresses only the fire's cause and origin.

Defendants' argument contorts the actual nature of Gahagan's expert opinion.  First, it appears that Plaintiff does not intend to offer Gahagan's opinion to prove that the light fixture was defective.  Rather, it is offered to support only Plaintiff's claim that the fire originated at the location of the light fixture and, therefore, was likely caused by the fixture—facts that, if proven, tend to establish that the design defect and/or negligent design did, in fact, cause the fire.

Second, Defendants have mischaracterized the basis of Gahagan's opinion.  Their claim that Gahagan's opinion is simply an adoption of Christmas's expert report is misguided.  Gahagan did, in fact, review Christmas's report and conclusions; however, he also reviewed the entire file in the case, taking into account and basing his opinion on the facts recited in Christmas's report, more than 60 photographs of the fire scene and the light fixture, Fire Marshal Lesniak's report, answers to interrogatories, and other evidence relevant to the fire's cause and origin.  Only then did Gahagan render an opinion as to the cause of the fire.  This is standard methodology for an expert who is unable to examine a fire scene—indeed, a defense expert retained after the fire scene can no longer be examined would be limited to reviewing similar evidence in order to arrive at an independent cause-and-origin conclusion.  Contrary to Defendants' argument, Gahagan's opinion testimony will not involve the simple transmission of hearsay testimony.  Rather, his opinion is

-19-

based on evidence appropriately considered under Rule 703, and reached as the result of reliable methodology under Rule 702. Accordingly, it is admissible and can be offered by Plaintiff in support of its contention that the fire originated at and was caused by the light fixture in question. In light of this evidentiary support, there is a genuine issue of material fact as to causation that the jury, not the Court, must consider.

b) Joseph Zicherman's Opinion as to Defect and Causation

Defendants further argue that Zicherman's opinion is inadmissible because it is based solely upon an article he previously wrote, and that, even if his opinion is admissible, it is insufficient to create a genuine issue of material fact. Defendants fail to cite any law in support of their argument; they posit merely that the opinion "fail[s] the test for admissibility,"[53] and argue that it is purely speculative.

Defendants do not claim that Zicherman is not qualified to provide expert testimony, and again, they have good reason to avoid such an argument. Zicherman has been a fire-safety consultant since 1974, and he holds a doctorate degree in fire-related sciences from the University of California. He has been involved in the fire-safety and fire-investigation fields for over 35 years. He has also been involved in the publication and review of fire-related journal articles, as both an author and an editor. There is no dispute that Zicherman is qualified to offer an expert opinion in this case.

Rather than attack Zicherman's qualifications, Defendants attack his conclusion that the allegedly defective light fixture was, more probably than not, the cause of the fire at issue in this case. They claim that the opinion is inadmissible because it is based on an article that Zicherman

---

[53] Defs.' Mem. in Support of Mot. for Summ. J. [Doc. # 23], at 21.

researched and wrote several years ago.  This article, which was published in a peer-reviewed journal in 2001,[54] does provide a basis for Zicherman's opinion.  It is not, however, the sole basis of his opinion—that is, Zicherman examined and evaluated the unique factual circumstances of this case before applying the theory that he adopted in that article to the facts of this case.  He reviewed Christmas's cause-and-origin report, Gahagan's concurrence with the report, Fire Marshal Lesniak's report, deposition transcripts, and photographs of the fire scene and the light fixture.  Moreover, he conducted a forensic examination of the incident light fixture and examined an undamaged and operating exemplar to ensure that his theory could apply to the subject fire.  After reviewing all of the relevant materials, he concluded that his theory concerning spring-loaded lampholders—which was subjected to extensive scientific testing in conjunction with his 2001 article—could be applied to the fire in this case.

Considering the method employed by Zicherman to arrive at his ultimate conclusion, the Court cannot find that his opinion is unreliable or inadmissible.  The process that Zicherman used in formulating his opinion is a well-accepted one: he examined relevant evidence, including the light fixture in question and an exemplar, and applied a previously reached theory to the evidence to determine that the fixture was likely the cause of the fire.  After considering the evidence that Zicherman reviewed, Zicherman's peer-reviewed article, and Zicherman's report, the Court is convinced that there are "good grounds"[55] for Zicherman's opinion, even if there may exist other grounds for some alternative conclusion.  Whether Zicherman's conclusion is correct is a question

---

[54] See Joseph Zicherman, Technical Note: The Fire Performance of Electrical Insulating Materials Used in Fluorescent Lighting Fixtures, 25 Fire & Materials 209–13 (2001).

[55] Paoli, 35 F.3d at 744.

for the jury, not the Court.  But because the opinion is admissible, there are genuine issues of

material fact concerning whether the fixture was defectively designed and whether the defect caused

the fire in this case.  Defendants' attack on the substance of Zicherman's conclusion—as opposed

to the reliability of his methodology—is inconsequential at this stage of the litigation; the parties'

dispute concerning the validity of Zicherman's defect and causation opinion must be settled by the

jury.[56]

Even though Plaintiff's expert opinions are admissible and create triable issues of fact

related to its design-defect claim, Defendants are nonetheless entitled to the entry of judgment on

Plaintiff's negligence claim.  Plaintiff has failed to offer any evidence in support of its claim that

Defendants negligently designed the light fixture.  This may be because Plaintiff does not intend to

pursue a negligence theory at trial.  In fact, Plaintiff implied to the Court at oral argument that it did

not intend to pursue any claim other than its claim based on strict liability for a design defect.

Principles of negligence and principles of strict liability for defective design are not so intertwined

that offering evidence in support of one theory is sufficient to sustain the other.[57]  Plaintiff has

offered evidence of a design defect for which Defendants may be strictly liable, but has not offered

evidence establishing Defendants' negligence in designing the light fixture.  As such, Plaintiff's

---

[56]  The Third Circuit has noted that district courts must "provide . . . plaintiffs with sufficient process for defending their evidentiary submissions." Padillas v. Stork-Gamco, Inc., 186 F.3d 412, 417 (3d Cir. 1999) (internal quotation omitted).  As such, it has held that district courts should conduct *in limine* hearings to provide "the side trying to defend the admission of evidence [with] an adequate chance to do so." Paoli, 35 F.3d at 739.  But "[a]n in limine hearing will obviously not be required whenever a Daubert objection is raised to a proffer of expert evidence. Whether to hold one rests in the sound discretion of the district court." Padillas, 186 F.3d at 418.  Since the Third Circuit's approach to such proffers focuses on protecting plaintiffs from having their expert evidence excluded without an opportunity to be heard, this Court is convinced that a hearing is not required if the evidence is deemed admissible.  Accordingly, the Court need not conduct a hearing to confirm what it has determined based on the record before it: that the opinions offered by Plaintiff's experts are admissible.

[57]  See Spino, 696 A.2d at 1172.

negligence claim cannot survive summary judgment.

Ultimately, then, Plaintiff's expert opinions are sufficient to support its strict-liability design-defect claim, but insufficient to support its negligent-design claim.  Thus, the Court will enter judgment in favor of Defendants on Plaintiff's negligence claim only.

### III.  CONCLUSION

Upon review of the parties' arguments and consideration of the entire record, the Court has determined that only one of Plaintiff's claims will survive Defendants' Motion.  While the Court will enter judgment in Defendants' favor on Plaintiff's breach-of-warranty and negligence claims, it declines to do so on Plaintiff's strict-liability design-defect claim.  Plaintiff has made a sufficient showing at this stage to warrant consideration of its claim by a jury.  Moreover, while Plaintiff is liable for allowing important evidence to deteriorate while failing to inform Defendants of a pending suit or to grant Defendants an opportunity to examine the evidence, Plaintiff's spoliation is not so serious as to require the entry of judgment in Defendants' favor.  But, to preserve and protect the integrity of the proceedings before this Court, the Court will sanction Plaintiff for its misconduct by invoking the spoliation inference at trial.

An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA,** Plaintiff, | : : : : |
| v. | : **CIVIL NO. 05-CV-6399** |
| **COOPER CROUSE-HINDS, LLC, et al.,** Defendants. | : : : : |

## ORDER

**AND NOW**, this 31st day of August 2007, upon consideration of Defendants' Motion for Summary Judgment [Doc. # 15], Plaintiff's Response thereto [Doc # 16] and Attachments in support thereof [Docs. ## 17–22], and Defendants' Memorandum in Support of the Motion for Summary Judgment [Doc. # 23] and Accompanying Exhibits [Doc. # 24], and after oral argument on the Motion, it is hereby **ORDERED** that Defendants' Motion is **GRANTED IN PART** and **DENIED IN PART**, as follows:

(1)     Defendants' Motion for Summary Judgment as to Plaintiff's strict-liability design-defect claim (Count I) is **DENIED**;[1]

(2)     Defendants' Motion for Summary Judgment as to Plaintiff's breach-of-warranty claim (Count III) is **GRANTED**;

(3)     Defendants' Motion for Summary Judgment as to Plaintiff's negligence claim (Count II) is **GRANTED**.

---

[1]  The Court reiterates its ruling that Plaintiff may proceed on its design-defect theory of liability only. Plaintiff may not pursue a manufacturing-defect claim—the Court's spoliation analysis would be materially different if Plaintiff intended to pursue such a claim, and the Court's decision to deny the Motion for Summary Judgment on the strict-liability claim relies upon Plaintiff's assurance that it does not intend to pursue such a claim.

It is **FURTHER ORDERED** that, in light of Plaintiff's spoliation and in lieu of entering judgment in Defendants' favor, the Court will give an adverse-inference instruction—also known as the "spoliation inference"—in its charge to the jury.

The Court will set this case for trial in due course.

It is so **ORDERED**.

**BY THE COURT:**

**/s/ Cynthia M. Rufe**
**CYNTHIA M. RUFE**